May it please the Court. My name is John Seidlitz. I have the honor today to represent Raymond Parent, an individual appealing a denial of Social Security disability benefits. I also would like to reserve a couple of minutes for rebuttal, if that's going to be necessary. The factual issue before the Court relates to medical treatment, which encompasses, I think, almost 800 pages. Well, there's administrative paperwork in the hearing in there, but we've got a huge record in here. And so to summarize the record, we have Parent who comes in with a second application. He's got a prior denial. Comes in. His pancreatitis gets worse. It gets worse to the extent he has a cyst develop. You know, I agree. I understand what the medical evidence is, but it seems to me that the ALJ made a finding without using the word that Parent was malingering. I mean, if you read this thing, it appears to me, look at, you know, the ALJ says that Parent's, quote, statements concerning the intensity, persistence, and limiting effects of the symptoms are not credible. That's ER at 30. And what's malingering? It's, you know, feigning some kind of an illness to try to get some kind of a gain out of it. And then he said that the residual functional capacity assessment was, quote, supported by the consultative examination by Dr. Weber. And Dr. Weber says malingering, malingering, malingering. So if you read this as a whole, I think you're up against a finding by the ALJ of malingering. And isn't that something that you've got that's a big problem for you? I think it would be a big problem if there was a finding of malingering in this time frame. But there simply isn't. The malingering finding No, there is. There is. He said, the ALJ said he is not credible. And then he says you add to that Weber from looking at it. Is the Weber thing all part of this record? It seems to be. No, it's not. It's from the prior case. Well, then why were people talking about it? I think that's why we're here. That's my understanding. But you didn't object to using the Weber information. I was not the representative at the hearing. The representative at the hearing was a non-attorney representative. And so the ALJ incorporated the prior medical record. Yes. Well, I think if that's the issue, if that's going to be the focus, that ALJs are allowed to incorporate the prior record, then what we're going to have to do is to do that. Well, it was remanded by the counsel. Isn't that correct? Exactly. Well, what's happened, if you're going to accept opening the old medical record, then the rules on finality on denial come into play. Well, wait a minute. Just to understand the procedural posture, he applied for benefits. He was denied. Right. Went up to the process, went up to the counsel. They reversed, correct? I believe so. And they sent it back down. That's on the first application. Right. They sent it back down. Right. And then when he's He makes another application. He's denied initially. He denied on the first application and does not follow the appeals process. Oh, that's right. The next day files a new one. No, he doesn't file it the next day. What he does is he files it after the pancreatitis flares. He files it later and backs up for the date of disability to the day after the decision. But the application is actually made in the next calendar year. Did you object anywhere to using a videotaped surveillance in Weber's conclusions on malingering? Same issue, Judge. I was not the ---- I know. I know. But did your side? You're stuck with what happened and what didn't happen. I didn't find any objection to using this videotaped surveillance where he's carrying around all these heavy things, claiming that he can't do it at the same time. The video surveillance relates to an incident in 2003. I understand that, but was there ---- it was used. Was there any objection anywhere at any time, including your brief, to using that? There is no objection that I've raised in the issues when I got it at district court. Right. So the record comes to us with the ALJ using Weber's ---- not saying I'm just going to find malingering and go away. He first looks at all the evidence and says, gee, I don't find this credible. And then guess what? That's corroborated by what happened before, when the guy got caught on video. Here ---- I think what happens is, if we're going to examine a finding from before, because Weber's finding relates to a prior period that is closed. It's a closed period. If we're going to reopen that period and allow ALJs to go back and incorporate findings from a previous period, from a previous hearing, that is closed. Well, he didn't exactly incorporate the findings. He did incorporate the medical records. All he said in terms of Weber is Dr. Weber's findings, as well as some of the other findings, support my decision that he's not credible. He said the guy got caught on video. Go ahead. I'm sorry. The problem with that is, with Weber, there was a psychological expert at the hearing. And so the nonrepresentative, nonattorney representative at the hearing goes through with that expert at the hearing and explores the issue of malingering. And the expert at that hearing says, I cannot say that there's any malingering because of these new medical findings, the new MRI findings. I cannot relate those findings to complaints of pain and problems. And I can't. It's beyond my expertise. And so the ALJ's language is, in that question, he says there's no finding of malingering. But can you tell me this? And he says, I cannot. Well, then let's go back to the credibility part. He said that he gave some reasons for concluding that he wasn't credible, such as crawling around in an estate sale, looking for drugs, while at the same time saying he was so incapacitated he could hardly stand up and turn on the television set. Right. And I think in terms of that, there is an issue there in terms of credibility that's a legitimate issue in front of the ALJ. Now the ALJ resolves that and says that means he hasn't proved his case. He hasn't convinced me that he's proved his case. In terms of what he physically did that day, if we focus on physical activities as opposed to the act of going out, because he'd run out of medications, his doctor wasn't available, and he couldn't get a refill on pain meds. The doctor's on vacation. That's in the record. So he does this. It's a bad deal. If you don't focus on the idea of going and stealing some dead person's prescription medications, if you focus on what he physically did at the estate sale, the Court's going to speculate on what he did, because there's no time frame, there's no physical activity. We don't know. You can draw pretty clear inferences. I mean, he how do you find an estate sale? First of all, you have to look around in the newspaper or something like that. And then you have to figure out where it is and you have to go there and you have to rummage around. I mean, it would never occur to me to go to an estate sale to look for drugs, but I guess because I don't use that kind of stuff. But it seems to me to be incompatible or inconsistent with what he said his lifestyle was all about. And so, you know, how can we second-guess the ALJ when he uses something like that that appears to you? You agree that sounds inconsistent with his description of his lifestyle. No, I don't think it is inconsistent, and it's requiring the Court and myself to speculate now. I'm from Montana. It's like the traffic here. It drives me crazy. Why is that? I'm not used to it. Where he's from, an estate sale is going to be something everybody knows about. You know about it. You don't read it in the paper. It's happening. It's a small community. It could be something that he sees, drives past, likelihood that he suspected there was medications there would be personal knowledge. You're asking us now to put our feet into the shoes of the fact finder, the ALJ. And the ALJ is the one that gets to do this. You can't re-argue your factual case here. All we do is look to see whether there's enough evidence to support this. Right. And here we are arguing or trying to discuss or speculate about physically what was involved in this. And I'm not going to go into the details. The ALJ made no inquiry of Parent to say, well, how much time did this take in terms of the — in fact, it was brought up by the representative. But in terms of the time frame, physically what was involved in this? Did this involve going across the street or in this little town, you know, going down, covering the town from one side to the other in five minutes, which, again, I suspect is why he would know or suspect that this person had died of something that, at end of life, involved a lot of high-power pain pills. But you're exactly right. You're not re-weighing the evidence. But what the ALJ is required to do, the Commissioner is required to put forth evidence that is specific enough that this Court can look at it and say there was not a decision to arbitrarily deny credibility. I mean, the language that's in there about no credibility is the standard language in every ALJ decision denying benefits. Roberts. Now, we use that kind of stuff, too. I'm not impressed. We have standard language, too. But there's no specific finding from that, other than that's my conclusion. That's the conclusion. What's the evidence about inconsistent behavior in the waiting room compared to once he gets ushered into the examining room? I can't respond because I don't know which doctor we're talking about. I didn't see it in any of the treating physician records. In terms of Neubauer, and Neubauer examined him and found him, all the comments that were made by treating physicians or examining physicians dealt with findings that there were problems. The one of the references that is made in support of this malingering is from a Dr. Neubauer, suggesting that Dr. Neubauer could not find problems, and therefore, this is something in support of the malingering issue. In the reply brief, I went through in detail all of the findings of Neubauer, because while etiology was unclear, the doctor's not relating it to an occupational accident. He's had two. He's not relating it to wear and tear in life. He's got a lot of osteoarthritis. Is that just from wear and tear in life, getting old, being a very heavy construction worker all his life? He's not saying what's causing it, but there's no question it is happening. And so I think in terms of the issue of malingering, you've got this prior to the malingering. Sotomayor, is our case law require a specific finding of malingering? There's been a decision. There's a case that says you don't need to have a specific you don't need to say I find malingering. But that's not to say you don't need to present the evidence of malingering. And in the time frame that you have to present the evidence of malingering. Well, when he says, you know, it was okay for him to rely upon Dr. Weber's report. The problem is Dr. Weber's report. If you read Dr. Weber's report, as Judge Trott said, it's malingering, malingering, malingering. And the thing that Dr. Weber's report relates to, first, it's a prior period. But the second thing it relates to is nothing to do with physical complaints. Her testing all relates to complaints of affect, they're all mental issues, affective disorders, psychosis, low intelligence, amnesiac, neurologic impairment. That's what the testing that she had was that was relied upon. So if we're going to go back and reexamine that, then we need to have the records she had in front of her. We don't even have those. There were three doctors at the work comp panel, three independent docs look at them, write a report, send it to her. She relies on that. We don't have to have that in front of us. The ALJ or the Commissioner does not review those in any kind of detail to say that based upon these findings, this is an event that is continuing after the last period. And so, I mean, I represent claimants. If I'm going to get to re-argue a medical condition that has been found was not disabling in the past, still applies now, even though there's no evidence in the current period. Do you want to save some time for rebuttal? I would. I would. Thank you. Good morning, Your Honors. My name is Michael Howard representing the Commissioner in the case of Parent v. Astru. Your Honors, in this case, the Commissioner agrees that the plaintiff did suffer injuries in a workplace fall in 2003. However, there is evidence here that the plaintiff went on to misrepresent his symptoms before the State Workers' Compensation System in his first claim for disability and in his present claim for disability. But there was no specific finding of malingering here. Your Honor, the ALJ did not explicitly use the term malingering. I would certainly agree with that. There was the expert that testified at the hearing who didn't opine that he was a malingerer. Well, Your Honor, if I might make two points in response. First, the ALJ did refer to Dr. Weber, whose only diagnosis was malingering. But to address the issue of the medical expert at the hearing, I believe plaintiff in the argument today might have been slightly inaccurate or I would disagree with the characterization of that medical expert. That medical expert did not state the plaintiff was not malingering. I would read that testimony at page 859 of the record as the medical expert, this testifying psychologist, declining to really offer an opinion on the issue of malingering as to whether or not the plaintiff was. The expert does state that the expert looked at Weber's report. I believe the expert did have that report, Your Honor, but did not necessarily have access to other records about physical complaints because he was a malingering psychologist. Perhaps you could clarify for us how Dr. Weber's report got into this record in this particular application for benefits, since that was in the earlier proceeding. Certainly, Your Honor. There would be a number of reasons why, given all the facts of this case, Dr. Weber's report is entirely relevant. It's only five months, four to five months, I believe, before the onset of disability claimed in this case in September 2007. Maybe it was relevant, but was it part of the record? Certainly, Your Honor, it was. It was admitted into the record, the 800-something page record, which is prepared by the Commissioner as part of the answer in district court. And the other stuff about, you know, before the district court, before the magistrate judge, Parent was arguing vociferously that the whole thing, that he wanted to reopen the whole thing. And there's a fine, there's a conclusion here, no, he doesn't get to reopen the whole thing, and I don't quite know what that means in terms of what happens to the stuff that was previous in his previous application. Well, Your Honor, I don't believe the plaintiff is arguing that that prior period should necessarily be reopened before this Court. I'm not certain if they argue that before the district court. The issue of reopening a prior ALJ decision involves some fairly specific regulations and lengths of period of time. I think within a one-year period it can be done for any reason. After four years it can be done for good cause. So I don't believe the issue of reopening is necessarily before the Court. What happened was, as came out in the argument earlier, was that plaintiff received this ALJ decision on the earlier period and did not pursue it further. I don't believe there's any appeals counsel remand. Plaintiff simply did not pursue it further. So Dr. Weber's report is simply one of several items of evidence in this record indicating that plaintiff is just outright misrepresenting his symptoms. Well, it looks like after the first decision, his pancreatitis got a little bit worse. Your Honor, I would acknowledge that his pancreatitis got worse. I mean, there's more objective evidence of his condition. Yes, Your Honor. However, the pancreatitis symptoms, as I understand, there's an acute more acute period of illness in September and October 2007, but that, as set out in our brief and in our facts in our brief, that responded to treatment, and the treating specialist for that condition said that he was doing well and could be followed on an outpatient basis, and at the hearing, plaintiff admitted that medications, and I think one of the medications was a pancreatic enzyme, were effective in treating this condition. So although there was that exacerbation of pancreatitis, it was relatively limited, and then it was treated well. A lot of, I would also note on that point of pancreatitis, in Plaintiff's briefing, they cite two points in the record where plaintiff lost weight due to this condition, but those treatment notes about losing weight appear to be even from before the relevant period in this case, during that acute period of illness. So plaintiff actually regained some weight after recovering from that condition. I think it's kind of interesting, you know, the ALJ just could have looked at Weber's report, I mean, assuming it's part of the record, and said this guy is nothing but a malingerer, he's just not credible in this story. He didn't do that. Well, Your Honor, I'd submit that the ALJ did expressly give weight to Dr. Weber's report, but then gave other reasons. So I think in a sense, if I'm addressing Your Honor's question, I think it's hard to say ultimately what was going through the ALJ's mind in writing the decision the way that he did. But it's certainly legally sufficient and should be affirmed. Dr. Weber's report is a very strong piece of evidence, but then there's other items of evidence supporting the decision, such as the scavenging for narcotics illegally, which was undermining plaintiff's credibility, not just because it is an activity, but also because it's drug-seeking behavior, as we set out in our brief. So, you know, the other thing that they raised was the ALJ discredited or didn't give much weight to Dr. Gorman. Yes, Your Honor. And the reason the ALJ's explanation for that is it leaves much to be desired. Well, Your Honor It's kind of a general statement. I believe the ALJ summarizes the treatment records at a couple points in the decision. But to answer Your Honor's question This is having compared Dr. Gorman's treatment notes with her assessment in Exhibits B, 15, F. The undersigned does not find support for the degree of limitations and frequency of rest breaks and absences identified. But then everybody else tries to explain what he was talking about, what she was talking about, you know, what the ALJ was concerned with. Well, Your Honor, I'd submit that even if the ALJ's finding on that page was relatively concise, I'd submit that still the ALJ's reasoning is sufficient. Well, what do you look at? What's the specific reason that? Well, Your Honor, I think the ALJ's decision provides enough context. But if we look at the actual record on this point of Dr. Forney Gorman's treatment notes and whether they support the opinion, I think it was very reasonable for the ALJ to question the doctor for that reason. Plaintiff has cited to an MRI finding that there's narrowing in certain passages in the back, a stenosis, and portrayed that as evidence strongly supporting their case. But I think all the objective medical evidence in this case, even setting aside the issue of outright misrepresentation, this objective medical evidence is actually much more equivocal. As we explain in our brief on page 39 of the brief, the treating physician, Dr. Forney Gorman, was not consistent in documenting actual symptoms resulting from this this these back injuries. So as the ALJ discusses when at step 3 of the sequential evaluation process, does this plaintiff have this severe back pain that might equal or meet or equal a listed impairment? Are there signs of sensation loss radiating out, for instance, from certain nerve distribution in the lower back? Are there evidence of specific reflex loss that is showing another type of nerve impingement? And there aren't those consistent findings in this case. One treatment record of Dr. Forney Gorman's treatment notes is that there's not a single I would submit that even if the ALJ's specific discussion of Dr. Forney Gorman at that page Your Honor was citing is fairly concise, we read the ALJ's decision as a whole, including the analysis at step 3 of the sequential evaluation process. And it's quite apparent that the ALJ's finding that there aren't these overwhelming objective evidence of nerve impingement actually causing symptoms and limitations that would cause these severe limitations that the treating physician is opining to. Dr. Forney Gorman is giving the opinion that plaintiffs, for instance, can only stand or walk for one hour in a workday. And I think the question is very reasonable. Do the objective findings in the record support that? And it was very reasonable for the ALJ to find that they did not. So is it routine for the, when there's an, is it, this is, this district is a little bit unusual. It's like all the medical evidence that was utilized for the prior application is dumped into this, to this application. Is that what, is that what usually happens in the? Your Honor, in my experience, it does vary. I think it depends on the facts of the case. There isn't necessarily a firm rule that I'm aware of as to how that is handled. I think it was entirely appropriate in this case because plaintiffs' real injuries, the severe injuries, would date back to 2002, 2003. So that the only reason that the alleged onset date in this case is September 2007 is because the prior decision was not pursued further. So the actual facts and the actual assessment of disability would, I'd submit, necessarily include looking back to that earlier evidence. He argued vociferously in the district court that the ALJ erred in not reopening the whole thing. I mean, he wanted to see it just as reopening the earlier one. His position was the whole thing ought to be part of the entire record. Well, Your Honor, even in the district court briefing, I don't believe Plaintiff established any, any error in the ALJ's decision not to reopening, reopen that claim. There's some fairly specific regulations involved in reopening that decision. And as I recall, there was no actual showing of any error on the ALJ's decision. So you recall if you don't reopen it that you can't use the evidence that was available? No, Your Honor. That ultimately depends on the particular facts of the case. If there was a supervening injury since Dr. Weber's report, that would explain some new symptoms. I think then, I think then this would be a somewhat different case, and the issue of malingering might be a little bit more attenuated. But there — but that isn't the case here. I just have one question, one last question for you. So was Dr. Weber's report prepared in connection with the workers' comp claim? I — if I might just check, Your Honor, I don't believe it was. It was prepared as a consultative examination for the prior application for Social Security benefits? Yes, Your Honor. It was through — it was on a referral from the State agency called the Disability Determination. Because it makes the initial determination. Yes, Your Honor. And regardless, I'd submit that some of the evidence from the workers' compensation claim that made it into the record that Plaintiff did not object to would also support the credibility finding, as noted in our brief. Okay. If I may also note in my remaining time a couple of points with Plaintiff's reply brief before the Court. In Plaintiff's reply brief, it refers to a supposed standard of clear and convincing evidence at pages 10 and 17 of the reply brief, and that appears to be a misunderstanding of the Court's term, clear and convincing reasons, for a credibility assessment. And as explained in the briefing, the Commissioner already objects to the standard of clear and convincing reasons, but clear and convincing evidence would clearly be misconstruing that, and that would be a very high evidentiary standard that simply does not apply in a Social Security appeal. And lastly, on the — in Plaintiff's reply brief, he raises the issue of side effects of the medication Cymbalta. We would argue that this is new in the reply brief and it has been waived. Unless the Court has further questions, we would simply ask that the Court affirm the Commissioner. Thank you. I think the focus the Court has made today on the issue of Dr. Weber's finding of malingering, I think, is the reason that we're here and the reason we're having oral argument. I mean, the issue becomes why is the ALJ relying upon a finding in a closed, in a previously closed case, that judicially it's closed, it's not reopened, it's not here. Counsel, I think, is correct. We're talking in pretty broad terms about what medical, what evidence comes in in a subsequent application. And if it's relevant, I think it comes in. So the question is, is it relevant in this time frame? The ALJ only used it as corroboration. The ALJ did not start out by saying, we're dealing with a malingerer here. Well, and there — and I would say that that, in my view of the evidence, is an error on the Commissioner's part because there is no other information that supports malingering. Absolutely not. Credibility. That doesn't support an issue of malingering. Credibility can go to, I don't believe you, but that's not a specific finding relative to malingering. But let me ask you this. Why does he have to make a specific finding of malingering? Why can't he just sort of look at Weber's report and kind of read his report and kind of cast doubt on Mr. Perrin's veracity? I think if it was in the relevant time frame, it would be a whole different argument here. If it was involving her opinions about what's occurring in this application, I think it would be right. It would be nice if we had that as an issue before us and there had been an objection, but there was not. There was not, and I can't address that. I wasn't there. Except that, I will defend the representative, because at transcript 859, the ALJ's question to the medical expert about malingering in terms of giving some kind of notice to the representative that we're going to deal with this issue is, question the evaluation that was done a few months ago before the beginning of our period of review, had a diagnosis of malingering, obviously Weber. He says this. The expert? This is the judge's question. To the expert? To the expert, the mental health expert. Without addressing that specifically, I don't even want to address that. Without addressing that specifically, malingering is one of multiple somatic types of mental health findings, and he goes on to talk about it. And ultimately, that expert says, I cannot offer an opinion under the facts of this case. But the representative is left hanging there that we're not addressing malingering. Well, there's no ---- you've read the record, too. I've read it two or three times. There's a later discussion with the representative about malingering. But there's no evidence of malingering. That's the problem in terms of our argument, is that there's no evidence for ---- Credibility? I don't believe you. You're telling me your residual functional capacity is X. I don't believe you. Okay. And without some type of objective support, that falls back into the rules on interpretations of treating physicians versus examining physicians. You're over your time, but I just want to ask you to respond to the ---- very quickly to the ALJ's decision, determination not to give much weight to Dr. Fornori's opinion, or Dr. Gorman's opinion. And I think in terms of this issue of malingering, the only way that he can come up with some reason to ignore the treating doctor, because ---- and I've set him forth in detail in the brief and in the reply brief. She has detailed findings over the course of, I think, 16 months of treatment, detailed findings that are supported by the MRR. The ALJ said her records don't support her ultimate restrictions. And I've set forth in the brief the findings and the records that I think do. And I ---- and there are no contrary findings. Right. Dr. Paul is the one who says he behaves differently in the waiting room than he does when I get him into the examiner room. And in the earlier time, too. Okay. All right. And that ---- and I did not examine medical records from the earlier application. I didn't look at those other than we have. Thank you, Your Honor. You put them into the record. I would agree with counsel. They're part of the record. The ALJ accepts them. They are part of the record. Okay. Whether they're relevant for the Commissioner to consider, I think, is an issue. But they are in the record. Thank you. Okay. Thank you. Thank you. Thank you, counsel. We appreciate your arguments. The matter is parent versus aster is submitted.
judges: Ripple, Trott, Paez